# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

DR. MENKEOMA LAURA OK,

        Plaintiff,

vs.

CHRISTUS HEALTH, CHRISTUS TRINITY CLINIC, TIFFANY EGBE, APRIL WALNOFER,

        Defendant(s).

Case No.: 6:25-cv-00233-JDK

## PLAINTIFF'S ORIGINAL AMENDED PETITION

COMES NOW the Plaintiff, DR. MENKEOMA LAURA OKOLI, and sues Defendants, CHRISTUS HEALTH, CHRISTUS TRINITY CLINIC, TIFFANY EGBE, APRIL E. WALNOFER, LACIE SHANK, and JOHN MCDONALD, and for cause of action shows:

## PARTIES

1.    Plaintiff, DR. MENKEOMA LAURA OKOLI, is a resident of Gregg County, Texas.

2.    Defendant, CHRISTUS HEALTH ("CHRISTUS") is a Texas not-for-profit corporation that maintains its principal office at 5101 N O' Connor Blvd, Irving TX, 75039 and may be served with process herein by serving its

registered agent for process, Corporation Service Company dba CSC - Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

3.    Defendant, CHRISTUS TRINITY CLINIC ("CTC"), is a Texas not-for-profit corporation that maintains its principal office at 910 E. Houston St. Tyler, TX 75702.

4.    TIFFANY EGBE is a resident of Gregg County, Texas, and may be served with civil process by serving her at her usual place of employment at 701 E. Marshall Ave. Ste 504, Longview, TX, 75601.

5.    APRIL WALNOFER is a resident of Gregg County, Texas, and, upon information, has recently completed the Residency Program on June 30th, 2025, and may be served with civil process by serving her at her home address at 818 Charlotte Dr, Longview, TX, 75601.

6.    LACIE SHANK is a resident of Gregg County, Texas, and may be served with civil process by serving her at her usual place of employment at 701 E. Marshall Ave. Ste 504, Longview, TX, 75601.

7.    JOHN MCDONALD is a resident of Gregg County, Texas, and may be served with civil process by serving him at his usual place of employment at 701 E. Marshall Ave. Ste 504, Longview, TX, 75601.

/ / /

/ / /

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction because Dr. Okoli asserts claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2(a)), pursuant to 28 U.S.C. § 1331.

9.      This Court also has subject matter jurisdiction over Dr. Okoli's state law claims, pursuant to 28 U.S.C. Section 1367, because her claims are so related to her federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

10.     Venue is proper in this District, as all the relevant acts and events giving rise to this lawsuit occurred within this District.

## BRIEF SUMMARY

11.     Defendants took adverse actions against Dr. Okoli, a black woman from Nigeria, that were motivated by discriminatory attitudes and feelings about Dr. Okoli's race and national origin, and were also in retaliation for reporting the Program Director's friend to Human Resources for workplace harassment, which resulted in an effort, led by the Program Director, to concoct a pretext to summarily and wrongfully terminate Dr. Okoli's employment and dismiss her from the CHRISTUS Internal Medicine Residency Program, in breach of Dr. Okoli's written Resident Agreement, and in violation of the Graduate Medical Education Handbook and the Residency Program's and the Hospital's written policies and procedures, as set forth in more detail below.

## FACTUAL BACKGROUND

12.    In 2022, Dr. Menkeoma Okoli ("Dr. Okoli"), a black woman from Nigeria, started her first term as a physician trainee ("Resident") in the CHRISTUS Internal Medicine Residency Program ("Residency Program").

13.    The purpose of the Residency Program is to provide resident physicians with training opportunities (primarily through the residents' provision of patient care while under the supervision of more experienced physicians) so they can develop their clinical skills, professional competencies, and gain practice in their chosen medical specialty, to become competent physicians.

### The CHRISTUS Residency Program

14.    During her residency, Dr. Okoli provided inpatient medical services at CHRISTUS Good Shepherd Medical Center (the "Hospital"), a medical facility located in Longview, TX, and outpatient clinical services at CTC in Longview, Texas.

15.    Both the Hospital and CTC are owned and operated by the CHRISTUS Health System ("CHRISTUS"). This international faith-based nonprofit healthcare system operates more than 60 hospitals and employs over 4,000 physicians in Texas. It is the sponsoring institution for the Residency Program, as well as several other graduate medical programs and fellowships.

16.    The Hospital is the primary clinical training site for the Residency Program.

17.    CTC is a multi-specialty medical group with over 1,140 physicians and advanced practice providers.

18.    In October 2021, CHRISTUS announced that Texas A&M University College of Medicine would start serving as the academic affiliate for the Residency Program. At the time, CHRISTUS had 36 internal medicine residents.

19.    The Residency Program is accredited under the general authority of the Accreditation Council for Graduate Medical Education ("ACGME"), which has rigorous, detailed requirements for medical residency programs, including *inter alia*:

a.   Residency programs must operate under the authority and control of a sponsoring institution;

b.   Sponsoring institutions must have a policy that provides residents and fellows with due process to protect Residents from capricious or arbitrary removal from residency programs;[1] and

c.   The residency's Program Director, among other things, must provide Residents with written notice of any alleged deficiencies in knowledge, clinical skills, professionalism, or other competencies,

---

[1] https://www.acgme.org/globalassets/pfassets/programrequirements/800_institutionalrequirements_2022.pdf
(See Sections IV.D and IV.E)

in order to give Residents a meaningful opportunity to understand the concerns and timely act to avoid any adverse action.

20.    The ACGME recognizes that a Resident is both an employee of the sponsoring institution (or affiliate) and a physician trainee, and therefore a Resident's claim to residency training is a legally protected "property interest deserving of appropriate due process before it is removed." That is why ACGME requires its residency programs to adopt an official Grievance and Due Process Policy, as set forth in more detail below.

21.    CHRISTUS receives federal funds related to the operation of the Residency Program and is therefore subject to Title VII of the Civil Rights Act of 1964.

## CTC is the Alter Ego of CHRISTUS

22.    At all relevant times, Dr. Okoli was employed by CTC as a Resident, pursuant to a Resident Graduate Medical Education Agreement ("Resident Agreement").

23.    CHRISTUS and CTC are owned and/or controlled by common owners, officers, and managers. In the alternative, CTC is controlled by CHRISTUS, the sponsor of the Residency Program, at least as it relates to the employment of Residents.

24.    Upon information and belief, Egbe, the Program Director for the Residency Program, was at all relevant times an employee of CHRISTUS, the

Hospital, or both.

25.     Therefore, there is a unity of control between CHRISTUS and the CTC, such that CTC is the "alter ego" of CHRISTUS.

### Dr. Okoli's Resident Agreement

26.     On or about May 16, 2024, based on the material representations and promises of CHRISTUS regarding the Residency Program and her continued employment as a physician trainee, Dr. Okoli renewed her Resident Graduate Medical Education Agreement ("Resident Agreement") for the last year of her internal medicine residency.[2]

27.     Pursuant to the Resident Agreement, Dr. Okoli was a salaried employee and was entitled to certain employee benefits, including malpractice and professional liability insurance, vacation days, sick days, group health, dental, and life insurance, among other employee benefits.

28.     Section 21 of the Resident Agreement provides that:

**The terms of this Agreement shall control the terms of Physician's employment.** Physician shall also be subject to the employment policies and procedures of CTC, CHRISTUS Health, and to the Residency Program policies and procedures as they exist and are amended from time to time, including but **not limited to the policies and procedures on resident complaints and**

---

[2] CHRISTUS Health Internal Medicine Residency program is three (3) years long.  Dr. Okoli first entered into a written Resident Agreement on July 1, 2022, which was renewed in 2023, and again in 2024. CHRISTUS Health is the sponsoring institution for the Graduate Medical Education Program.

**grievances,** professional, parental, and sick leave benefits, resident services (sexual and other forms of harassment), leave of absence, well-being and counseling services, supervision and accountability, transitions of care, learning and working environment, professionalism, physician impairment/substance abuse, and residency closure/reduction. **A copy of the Residency Program's Handbook, the CHRISTUS Health GME Resident/Fellow Handbook, and CTC's employee manual ("Manual") will be provided to Resident following the execution of this Agreement and the Manual may thereafter be amended by CTC in accordance with CTC's policies. In the event of a conflict between Residency Program policies and CTC policies, including without limitation policies regarding continuing medical education, the Residency Program policies will control.**

(emphasis added).

29.    Section 15(c) of the Resident Agreement provides that

Notwithstanding any other provision of this Agreement to the contrary, CTC, in consultation with the Program Director, shall have the right, in its sole discretion, to terminate this Agreement immediately upon written notice to Resident upon occurrence of any of the following:

(i)     any termination, suspension, withdrawal under threat of disciplinary action, probation, limitation, or reduction in Resident's house staff privileges at Hospital or any other Hospital or health care facility.

(ii)    any termination, suspension, probation, limitation, revocation or lapse of Resident's (A) Physician in Training permit or Institutional Permit from the State of Texas, (B) qualification under the Medicare or Medicaid programs, or (C) qualification for participation in the Residency Program;

(iii)   if, in the sole judgment of CTC, Resident becomes uninsurable at standard rates under such insurance carriers or programs of self-insurance as CTC elects to utilize to meet the insurance requirements set forth in this Agreement.

(iv)    in the event of the death of Resident, or the ill health or other disability of Resident which prevents or makes inadvisable Resident's continued provision of services hereunder.

(v)    the charging or conviction of Resident of any felony or any misdemeanor involving moral turpitude;

(vi)    if, in the judgment of CTC, Hospital, or the Residency Program, individual health or safety is in imminent and serious danger from Resident's action or Resident does anything to harm the business reputation of CTC, Hospital, or the Residency Program;

(vii)    if Resident violates any term of CTC's policies as they exist from time to time; or

(viii)    if any representation, warranty or covenant of Resident hereunder is or becomes false or untrue.

30.    CHRISTUS never provided Dr. Okoli with a copy of the CTC Employee Manual referenced in the Resident Agreement. Upon information and belief, CHRISTUS never provided a copy of a CTC Employee Manual to any of the CHRISTUS Internal Medicine Residents.

31.    The Resident Agreement specifies that Dr. Okoli's employment is for a specific term, and it does not include a disclaimer that the Resident Agreement does not alter the at-will employment relationship.

**The Official Graduate Medical Education Resident Handbook**

32.    CHRISTUS Health official 2022-2023 Graduate Medical Education Resident and Fellow Handbook ("GME Handbook"), which, among other things, provides information about Resident salary, benefits, and the program's policies.

33.    The GME Handbook also explains that the CHRISTUS Graduate

9

Medical Education Committee (GMEC) works with the residency program's Designated Institutional Officer (DIO) to provide oversight of the Hospital and each of the Hospital's residency programs.

34.    The GME Office, under the direction of the DIO, is responsible for *inter alia* policy formulation, development, and implementation.

35.    The GME Handbook also provides a list of the GME Policies that apply to Residents, including the policies regarding Grievance and Due Process (ORA-GME007) and Harassment (ORA-GME009).

36.    The "Reporting Concerns" section of the GME Handbook provides that "[e]very CHRISTUS Health Associate and medical staff member has the duty and responsibility to raise concerns without fear of retaliation."

37.    The GME Handbook does not include a disclaimer that it does not alter the at-will employment relationship.

**The Residency Program's Official Policies and Procedures**

38.    The Residency Program's official 2024-2025 Policies and Procedures (the "Residency Policies") state that the Program Director is responsible for the overall administration of the residency program, including the evaluation, promotion, or discipline of Residents.

39.    The Residency Policies require the Program Director to "provide a clinical learning environment in which Residents may raise and resolve issues without fear of intimidation or retaliation."

40.    The Residency Policies claim the residency program has an "Open Door Policy" and that the Program Director must ensure that a Resident's concerns are dealt with expediently, compassionately, and confidentially.

41.    The Residency Policies also provide that the "official policy" for "Grievance and Due Process" is policy ORA-GME007, which can be found "on the Hospital's New Innovations Home Page."

42.    The Residency Policies state that the official Grievance and Due Process policy provides the "process by which the program can address issues with residents such as professionalism or other core competencies" and that the "**processes are outlined in detail for due process**" and for the benefit of the Resident or person reporting. (emphasis added).

## Corrective Action Policy

43.    Under the section entitled "Corrective Action," the Residency Policies summarize the official Grievance and Due Process found in ORA-GME007, and the actions the Clinical Competency Committee ("CCC") may take if it finds that a Resident's performance falls below expectations; namely Performance Program Plan ("PIP"),[2] Remediation, Probation, Suspension, and Dismissal.

## Corrective Action: PIP

44.    The Residency Policies provide that a Resident who may not be meeting

---

[2] Also known as a "Performance Improvement Plan" or "PIP".

the residency program's expectations "may be placed in a Performance Improvement Plan, or in more serious cases, remediation or probation."

45.    The Residency Policies further explain that if a Resident is placed in a PIP, the "Faculty Mentor and the Program Director will meet with the Resident to review progress and provide written feedback" monthly.

### Corrective Action: Remediation

46.    In more serious cases, Residency Policies explain that remediation might be used to help underperforming Residents "become fully competent physicians," which is "an important responsibility of the program leadership."

47.    However, as the Residency Policies explain, the purpose of remediation is to help the Resident succeed:

> **... a resident's PIP indicates the inability for the resident to meet the standards of the program**, as deemed by the Program Director and members of the CCC. Remediation status of a resident may be reported to CHRISTUS GMEC **in an effort to maximize resources for the success of the resident and the program**.

(emphasis added).

### Corrective Action: Probation

48.    The Residency Policies provide that "a resident is formally placed on probation" when the Resident fails to comply with the "Performance Improvement Plan" or when "serious deficiencies exist, as determined by the Program Director." Examples of "serious deficiencies" provided in the Residency Policies include:

> a. Clinical skills that are substantially below that expected of a Resident;

    b. Work habits (attendance, tardiness, incomplete charts, reading) are not of an acceptable professional standard;

    c. Serious or multiple complaints about relationships with patients, families, staff, colleagues or Faculty; or

    d. Unethical behavior, including substance abuse or any other illegal activities.

49.    Pursuant to the Residency Policies, a Resident's failure "to perform to the standards defined in terms **set forth in probation** may result in dismissal from the program." (emphasis added).

## Corrective Action: Dismissal

50.    The Residency Policies state that a Resident's failure to satisfy the terms of probation, or serious misconduct, such as "[s]ubstance abuse, felony conviction, or involvement in unethical or illegal activities," may be grounds for automatic dismissal of a Resident.

51.    The Residency Policies go on to state that "[u]nethical, illegal or very serious concerns are cause for suspension and dismissal from the program."

52.    The Residency Policies do not contain a disclaimer that the Residency Policies do not modify the at-will employment relationship.

## The Official Grievance and Due Process Policy

53.    ORA-GME007, the official Grievance and Due Process Policy that is listed in Residency Agreement, the GME Handbook, and the Residency Policies, provides that the purpose of the Grievance and Due Process Policy is to provide "the procedure for Resident/Fellow grievance and due process, which

may be utilized when corrective or other disciplinary actions taken against residents/fellows could result in probation, dismissal, non-renewal of contract or non-promotion to a subsequent PGY [Post Graduate Year] level."

54.    The Grievance and Due Process Policy further provides that

> All GME programs at CHRISTUS Health will promote equitable, fair, and efficient resolutions for general grievances that may arise in the course of residency/fellowship training due to corrective actions, including probation, dismissal, non-renewal of contract, and non-promotion to a subsequent PGY level.

55.    Section B of the Grievance and Due Process Policy, entitled "Probationary Period," provides that

> a. **If a resident/fellow fails to improve performance during the remediation, he/she may be placed on probation**.
>
> b. **Opportunities will be provided and documented for the resident/fellow to discuss with the program leadership the basis for probation, the expectations of the probationary period, and the evaluation of the resident's/fellow's performance during the probation**.

56.    Section C of the Grievance and Due Process Policy, entitled "Misconduct," provides that

> **Dismissal without warning may be justified in response to specific examples of misconduct.** Examples include (but are not limited to): lying, falsification of a medical record; violation of medical record privacy; being under the influence of intoxicants or drugs; disorderly conduct; **harassment of other employees**, or the use of abusive language on the premises; fighting, encouraging a fight, or threatening, attempting, or causing injury to another person on the premises.

(emphasis added).

57.    As provided in ORA-GME007, CHRISTUS promised that its residency program will promote "equitable, fair, and efficient" resolution of "grievances" that may arise during a Resident's training due to corrective actions.

**Disparate and Discriminatory Treatment of Dr. Okoli**

58.    In February 2024, Dr. Tiffany Egbe ("Egbe"), Program Director for the Residency Program, forced Dr. Okoli to work a long Intensive Care Unit (ICU) shift (Pager Day) and then scheduled her for a 24-hour ICU call the very next day.

59.    Egbe did this even though Dr. Okoli informed her that she was sick that day.

60.    Dr. Okoli was the only resident (among six others in the unit) who was forced to work these excessive hours. When she asked why she was forced to work so many hours in such a short time, Egbe told Dr. Okoli to "do the shift and stop complaining."

61.    After working very long hours, Dr. Okoli missed work for the next two days due to sickness. When Dr. Okoli returned to work, Egbe told her, "You are lucky you are truly sick, given how you look and your eyes too; otherwise, I would have dealt with you more."

62.    Egbe then made Dr. Okoli repeat the entire ICU rotation even though she did nothing wrong and was only six (6) days away from completing the rotation.

63.    Residency Policies provide that, "Residents are permitted six (6) sick days. Sick days should be used when Resident is feeling unwell and unfit to work. A physician's note will be required after two (2) consecutive days of absence from work".

64.    Also, according to the ACGME, an organization that accredits graduate medical education programs in the United States, including residency and fellowship programs, states,

> There are circumstances in which residents may be unable to attend to work, including but not limited to fatigue, illness, family emergencies, and medical, parental or caregiver leave. **Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities.** The program must have policies and procedures in place to ensure coverage of patient care and ensure continuity of patient care. **These policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work**.

(emphasis added).

65.    Despite the Residency Policies and the applicable ACGME policies, Egbe imposed adverse consequences on Dr. Okoli for raising a complaint about the excessive work schedule and for missing two days of work due to illness.

66.    Egbe's harsh treatment of Dr. Okoli was unwarranted and, upon information and belief, materially different from how she treated other Residents in similar circumstances.

### Egbe Disparaged Dr. Okoli's Hereditary Medical Condition

67.    When Dr. Okoli asked herself why Egbe was treating her so

unfairly, she recalled some disturbing incidents involving Egbe, including:

a.  Egbe made an offensive and demeaning comment to Dr. Okoli in her first year of residency about her hereditary medical condition (essential tremors). Egbe told Dr. Okoli, "*I was observing you during your ICU rotation, and I saw your hands shaking while you were presenting patients. One might think you are truly confident, but it's obvious that you are not*".

b.  Despite Dr. Okoli telling Egbe that the tremors were the result of a hereditary medical condition, Egbe did not apologize but appeared irritated and annoyed by her explanation.

c.  Egbe's derogatory comment regarding Dr. Okoli's essential tremors was very hurtful and caused Dr. Okoli to become acutely self-conscious about her medical condition.

### Egbe Denigrates Dr. Okoli for Not Being From the US

d.  Egbe made a disparaging remark about Dr. Okoli's national origin in her second year of residency during a dispute relating to her meeting a doctor in the physician's lounge.

e.  Egbe confronted Dr. Okoli, telling her that someone had reported seeing her eating lunch in the physician's lounge.

f.  Dr. Okoli denied the allegation and stated that she did not have lunch in the physician's lounge. She explained that the only reason she was there was that a doctor had asked her to meet him there to discuss patient care. Dr. Okoli even showed Egbe a text message from the doctor asking her to meet with him in the physician's lounge. In her defense, she also noted that there were other Residents who had gone into the physician's lounge under similar circumstances (which was confirmed in a text message from Program Coordinator Cindy Harrison)

g.  Egbe responded by angrily attacking Dr. Okoli's national origin: "*This is not how it is done in this place and in this country; I will soon clip your wings*!"

17

68.    As a result of Egbe's unfair treatment relating to her missing ICU shifts due to illness and the physician's lounge, and because of Egbe's past offensive comments, including comments relating to Dr. Okoli's hereditary medical condition and her national origin, Dr. Okoli believed that Egbe was targeting her for special adverse treatment. Therefore, to avoid further adverse actions, Dr. Okoli decided to minimize her contact with Egbe, including attendance at conferences led by Egbe.

**Egbe Forces Dr. Okoli into an Unfair Performance Improvement Plan**

69.    Under Residency Policies, a Resident is not required to attend teaching conferences with any specific physician supervisor. Instead, the Residency Policies only required an overall attendance of at least eighty (80) percent of all available conferences.[3]

70.    Nevertheless, on August 15, 2024, Egbe forced Dr. Okoli to participate in a Performance Improvement Plan ("PIP") on Professionalism, primarily due to what Egbe claimed was Dr. Okoli's "poor conference attendance."

71.    Dr Okoli was attending the required 80% of all available conferences at the time Egbe forced Dr. Okoli to enter the PIP program.

72.    According to the Residency Policies, a PIP is intended to be used

---

[3] ACGME requires resident attendance at conferences to be at least 70%.

by the Hospital as a tool to help Residents improve any observed or perceived deficiencies in a Resident's medical skills or professional conduct.

73.    The PIP that Egbe designed for Dr. Okoli imposed unrealistic goals, including that Dr. Okoli attend a perfect one hundred (100) percent of all available conferences.

74.    Upon information and belief, Egbe did not place any other internal medicine residents on Dr. Okoli's team, whose attendance levels were below those of Dr. Okoli's, into a PIP program.

75.    Egbe told Dr. Okoli that if she did not satisfactorily complete the PIP, the next step, per the Residency Policies, would be to put her on probation.

76.    Egbe's threat of putting Dr. Okoli on probation was shocking and terrifying since being placed on probation would appear in her employment records and could adversely affect her future medical career.

77.    Dr. Okoli objected to the PIP designed by Egbe and initially refused to sign an agreement to enter the PIP, which Egbe insisted Dr. Okoli sign.

78.    Dr. Okoli eventually signed the agreement to enter the PIP, but under duress due to the threat of further retaliation by Egbe if she did not agree to the PIP.

79.    Despite Egbe's unfair PIP, Dr. Okoli increased her overall conference attendance to ninety-seven (97) percent.

## Walnofer Harasses and Assaults Dr. Okoli

80.     Dr. April Walnofer ("Walnofer"), one of the Hospital's Chief Residents, is a white woman and a close friend of Program Director Egbe.

81.     On September 27, 2024, Egbe showed up to the sign-out session for the first time that month, which was unusual.

82.     After the sign-out session, as Dr. Okoli was leaving the conference room, Walnofer approached her, saying, "I need to talk to you." Walnofer then stepped in front of Dr. Okoli to physically obstruct her from leaving the conference room.

83.     At that moment, Dr. Okoli looked back to see whether Egbe was going to intervene; however, as soon as Dr. Okoli's eyes met her's, Egbe quickly turned away and did nothing.

84.     When Dr. Okoli asked Walnofer what was wrong, Walnofer raised her voice and angrily said, "You were disrespectful to me during sign-out last week, and I want to talk about it."

85.     Dr. Okoli, wanting to avoid a hostile confrontation, told Walnofer that she did not have the time as she was on duty and needed to go back and attend to patients, but Walnofer snapped back loudly, "The GME[4] told me that

---

[4] The "GME" refers to the leadership team of the Graduate Medical Education program, which included Egbe, DIO McDonald, Program Coordinators Lacie Shank ("Shank") and Cindy Harrison.

you don't have time for anyone, so I am here to stand in your face!"

86.    Walnofer continued to physically obstruct Dr. Okoli's way of escape, first by blocking the doorway of the conference room and then by standing in her way in the reception area exit.

87.    Despite Dr. Okoli's pleas for Walnofer to stop and leave her alone, Walnofer continued to stalk Dr. Okoli in a menacing and threatening manner for several minutes.

88.    Walnofer became more agitated, aggressive, and threatening as Dr. Okoli made her way from the hallway into the elevator.

89.    Walnofer forced her way onto Dr. Okoli's elevator, continuing to disrespect Dr. Okoli's personal boundaries.

90.    After Dr. Okoli exited the elevator, Walnofer continued to follow and harass Dr. Okoli. As Dr. Okoli was close to entering the skywalk bridge connecting Medical Plaza 1 to the main hospital, Walnofer saw a couple of first-year residents approaching and finally stopped her harassing conduct and walked away.

91.    Pursuant to Residency Policies, workplace harassment and assault are cause for immediate termination.

92.    Upon information and belief, CHRISTUS fired a medical resident for harassment and assault a few months before the Walnofer incident; however, upon information and belief, CHRISTUS failed to take any

disciplinary or adverse action against Walnofer, and despite her serious misconduct, she was allowed to complete her Residency Program training.

93.    Moreover, despite witnessing Walnofer loudly confronting Dr. Okoli and attempting to physically obstruct Dr. Okoli from peacefully exiting the GME conference room, Egbe, the Program Director, responsible for the overall administration of the residency program, including the discipline of Residents, failed to intervene to stop Walnofer's public harassment and humiliation of Dr. Okoli or take any disciplinary action against Walnofer.

### Dr. Okoli Reports Walnofer, but the Hospital Took No Action

94.    On September 30, 2024, Dr. Okoli reported Walnofer's stalking, harassment, and assault to the Hospital's Human Resources department.

95.    Despite reporting Walnofer to Human Resources, upon information and belief, the Hospital never investigated or disciplined Walnofer for her misconduct.

### Evidence the Hospital Altered Dr. Okoli's Conference Attendance

96.    On October 8th, 2024, Dr. Okoli noticed irregularities with her attendance records. Dr. Okoli discovered that her attendance rate was being manipulated to show a decline.

97.    After Dr. Okoli wrote to Egbe and the GME, providing evidence of her actual attendance and demanding an explanation for the discrepancies in

her conference attendance percentage, Shank blamed the changed percentages on "configuration by ACGME."

98.     Later that same day, the Hospital quietly corrected its records to reflect Dr. Okoli's actual conference attendance rate.

### Egbe Retaliates Against Dr. Okoli for Reporting Walnofer

99.     On October 9, 2024, Dr. Okoli attended her monthly PIP meeting with Egbe and Shank to receive feedback and review her progress.

100.     Dr. Okoli received positive feedback for her consistent attendance at conferences. The October 9, 2024, Update Memo ("Memo") noted:

> "This commitment demonstrates her [Dr. Okoli's] engagement with the learning process and her adherence to one of the key expectations outlined in her improvement plan. Dr. Egbe commended her efforts and emphasized the importance of continued participation in professional development activities.

101.     The Memo states that "despite progress in certain areas, significant concerns remain regarding Dr. Okoli's interpersonal communication skills." However, the phrase "significant concerns" was never used in the meeting, and Egbe never advised Dr. Okoli that any alleged interpersonal communication skills shortcomings were "serious" or "concerning" or that Dr. Okoli was in jeopardy of having her employment summarily terminated.

102.     The Memo also falsely states that during the October 9, 2024, meeting, "Dr. Okoli reported Walnofer to Human Resources for her stalking

and harassment." On the contrary, Egbe was the one who initiated the confrontation at the meeting by berating Dr. Okoli for reporting Walnofer.

103. When Dr. Okoli tried to defend herself for reporting Walnofer to Human Resources, telling Egbe that Walnofer's actions were unprofessional, hostile, and threatening, and that she feared for her physical safety due to Walnofer's aggressive and persistent stalking, Egbe accused Dr. Okoli of misconduct for reporting Walnofer, telling Dr. Okoli, "How dare you?! You are on a PIP!"

104. After Egbe confronted Dr. Okoli at the October 9, 2024, meeting for reporting Walnofer to Human Resources, Egbe targeted Dr. Okoli for retaliatory action and began soliciting others at the Hospital to provide negative information about Dr. Okoli to her and the GME.

105. The next day, on October 10, 2024, Egbe provided false, inaccurate, incomplete, and misleading information to the GME's Clinical Competency Committee (CCC) about the October 9, 2024, meeting with Dr. Okoli to persuade the Hospital to summarily terminate Dr. Okoli's employment.

106. Based primarily on the false, inaccurate, incomplete, and misleading reports about Dr. Okoli by Egbe, the CCC agreed to defer to Egbe and the GME leadership, which includes Egbe and Dr. McDonald, to make the "final decision" regarding Dr. Okoli's future employment with the Hospital.

/ / /

**As Further Retaliation, Egbe Creates the Final Pretext**

107.    On October 31, 2024, Dr. Okoli received a text from Lacie Shank asking her to meet at the GME conference room after the morning report conference.

108.    When she walked into the GME conference room, Dr. Okoli was surprised to find Walnofer sitting next to Shank.

109.     A moment after Shank asked Dr. Okoli to take a seat, Egbe walked into the GME conference room.

110.    When Dr. Okoli asked why she had been asked to come to the GME conference room, Egbe said it was to review the expectations for the upcoming ICU rotation.

111.    When Dr. Okoli asked why the other Residents weren't in attendance, Egbe said they could not make it.

112.    When Dr. Okoli asked why the meeting could not be held virtually, so the other Residents could attend, Egbe shut Dr. Okoli down and directed Walnofer to continue the meeting and review the expectations for the upcoming ICU rotation with Dr. Okoli.

113.    Dr. Okoli was confused as to why a meeting with Shank, Walnofer, and Egbe was needed just to have Walnofer review the expectations for the upcoming ICU rotation, since the expectations had been the same since her

first year in the residency program. In fact, Walnofer did not introduce any new expectations or provide any special instructions to Dr. Okoli.

114.    After Walnofer reviewed the ICU expectations, Egbe asked Dr. Okoli if she had anything to add to what Walnofer had just discussed. Dr. Okoli replied, "No, there is nothing to add."

115.    Egbe then asked Walnofer to leave the room. After Walnofer left the GME office, Egbe, with Shank at her side, asked Dr. Okoli: "During my conferences, when I ask you if you have any feedback for first-year residents after they presented their cases, you tell me you do not. Why is that?"

116.    Dr. Okoli responded that the first-year residents were all doing a fine job, so she did not have any helpful comments to offer. All Egbe said in response was, "That is all. You can leave." Dr. Okoli left the meeting, still confused about the true reason for the meeting.

**Egbe Provides False Information About Dr. Okoli to the CCC**

117.    Egbe prepared a written report to the CCC about the October 31, 2024, meeting, falsely claiming that it was a PIP update meeting; however, Egbe, Shank, or Walnofer never notified Dr. Okoli before she went to the GME office that day that it was a PIP meeting and they never made such a claim at any time during the meeting.

118.    On the contrary, Egbe specifically stated at the beginning of the October 31 meeting that it was to review the expectations for the upcoming

ICU rotation.

119.    Additionally, Dr. Okoli's next scheduled PIP follow-up meeting was not until November 14, 2024, so Dr. Okoli had no understanding or expectation that the October 31, 2024, meeting was related to the PIP.

120.    Egbe's report to the CCC about the meeting with Dr. Okoli on October 31, 2024, was false, inaccurate, incomplete, and misleading in the following respects:

   a.    Egbe misrepresented the reason Dr. Okoli asked why the meeting could not be conducted virtually, so Egbe could falsely allege that Dr. Okoli did not "value collaborative discussions."

   b.    Egbe's report falsely concludes that:

   The meeting highlighted significant concerns regarding Dr. Okoli's professionalism, interpersonal and communication skills, and her ability to work effectively with others. The lack of engagement and unwillingness to participate in collaborative discussions **raise issues related to patient safety and the overall functioning within a health care team**.

(emphasis added).

121.    Egbe included the inflammatory accusations in her false and misleading report of her meeting with Dr. Okoli on October 31, 2024, in order to support Egbe's pretext for why the Hospital needed to summarily terminate Dr. Okoli's employment.

122.    Egbe never previously raised any concern with Dr. Okoli about her lack of feedback to first-year residents or her alleged concerns about "patient

safety and the overall functioning within a health care team" during or at any time before the October 31, 2024, meeting.

123.    Dr. Okoli's alleged failure to provide feedback to first-year residents after Dr. Egbe's conferences did not violate any Residency Policies.

124.    During the entire period of Dr. Okoli's employment as a Resident, Dr. Okoli never received any notice from Egbe, the GME, or anyone else at the Hospital about their alleged concerns that Dr. Okoli's "professionalism, interpersonal and communication skills, and her ability to work effectively with others" was putting "patient safety and the overall functioning within a health care team" at risk.

125.    On the contrary, Dr. Okoli previously received numerous positive evaluations attesting to her professionalism and communication skills with staff, patients, and their families, even from Egbe.

**CHRISTUS Wrongfully Terminates Dr. Okoli's Employment**

126.    On November 7, 2024, based on the false, inaccurate, incomplete, and misleading information Egbe provided to the CCC, including the meeting on October 31, 2024, Egbe recommended, and CHRUSTUS approved, the summary termination of Dr. Okoli's employment.

127.    As a justification for summarily firing Dr. Okoli, the CCC noted that Dr. Okoli's failure to show adequate progress during her PIP was "detrimental to patient safety…" even though this allegation is demonstrably

false, neither Egbe nor any other member of the GME gave any notice of this allegation to Dr. Okoli during her PIP, nor did they indicate that the alleged "lack of progress" could lead to the immediate termination of her employment.

128.    The CCC also justified its immediate termination of Dr. Okoli's employment by falsely alleging that Dr. Okoli's conduct was "negatively impacting the team dynamic and the learning environment for her colleagues." However, even if these allegations were true, which they are not, it would not justify the immediate termination of Dr. Okoli under the Residency Policies.

129.    Egbe and the GME intentionally failed to document a performance evaluation of Dr. Okoli by an Attending Physician during her Palliative care rotation in October 2024. This evaluation stated that Dr. Okoli is a "*natural communicator- good with patients & families.*"

130.    Egbe, the GME, and the CCC ignored the Attending Physician's positive evaluation of Dr. Okoli and used a negative evaluation solicited from a palliative care nurse instead to bolster Egbe's unlawful agenda, even though Resident performance evaluations are normally done by the Attending Physician, not by nurses.

131.    Dr. Okoli also learned that on September 30, 2024, Egbe had reached out to a different Attending Physician via email seeking damaging information on Dr. Okoli to support her planned termination. Egbe asked, "*Were there any issues with patient care?*" to which the Attending Physician

responded, "*No significant issues with patient care. I believe she has potential to be a great Physician*".  Egbe, the GME, and the CCC ignored this positive review.

132.    Later, on November 7, 2024, Egbe provided Dr. Okoli with an official Notice of Employment Termination.

133.    CHRISTUS terminated Dr. Okoli's employment seven months before the completion of Dr. Okoli's internal medicine residency.

134.    Dr. Okoli was shocked when she was notified that the CHRISTUS had summarily terminated her employment because she had done nothing that would have warranted her immediate termination of employment under the Residency Policies.

135.    Dr. Okoli was also shocked because, according to Egbe and the Residency Policies, the next step would have been probation if she did not meet the PIP goals to Egbe's satisfaction, not immediate termination of employment with the Hospital.

136.    Dr. Okoli was also shocked because neither Egbe nor anyone else at CHRISTUS had given her any notice about the alleged concerns with Dr. Okoli's "professionalism," and the other matters were so serious that they were grounds for the immediate termination of her employment.

137.    On the contrary, Egbe and CHRISTUS, as set forth in the Residency Policies, had assured Dr. Okoli that except for serious misconduct,

like the commission of crimes or gross misconduct, Dr. Okoli's conduct was subject to CHRISTUS' Grievance and Due Process policy, which required remediation, probation, and if needed, suspension, before terminating Dr. Okoli's employment.

138.    Therefore, the immediate termination of Dr. Okoli's employment contravened Egbe's representations and the Residency Policies.

139.    Dr. Okoli was only seven months away from completing her internal medicine residency and had every expectation of becoming a licensed Physician at that time.

140.    The Hospital's wrongful termination of Dr. Okoli's employment, if it is allowed to stand, will cause irreparable harm to Dr. Okoli's medical career and any future prospect of employment in her chosen medical profession.

**Dr. Okoli Appeals, Files EEOC Complaint, and Obtains Right to Sue**

141.    On January 21, 2025, Dr. Okoli appealed the termination to the GME's Appeals Panel. The GME's Appeals Panel circled the wagons and sided with Egbe and the CCC's decision to summarily terminate Dr. Okoli's employment, even though Dr. Okoli provided damning evidence that the actions of Egbe and her enablers were discriminatory, violated Dr. Okoli's right to due process, and breached the Resident Agreement.

142.    On February 26, 2025, Dr. Okoli filed a charge of discrimination based on national origin, race, retaliation, and ADA retaliation with the EEOC.

CHRISTUS failed to provide a position statement and refused to accept the EEOC's offer to mediate.

143.    On May 5, 2025, Dr. Okoli requested, and the EEOC issued its Notice of Right to Sue. This suit now follows.

## *COUNT ONE*
### *Unlawful Employment Discrimination - National Origin and Race (Title VII, Civil Rights Act of 1964; Tex. Labor Code, 21.051, et seq.)*

144.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

145.    To establish a prima facie case of disparate treatment race and national origin discrimination in Texas, a Plaintiff must show that she was: (1) a member of a protected class; (2) qualified for her position; (3) subject to an adverse employment action; and (4) treated less favorably because of her membership in that protected class compared to other similarly situated employees who were not members of the protected class. *Harris Cnty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 196 (Tex. App. 2015).

146.    Plaintiff is a black woman of Nigerian nationality and, therefore, is a member of a protected class.

147.    Plaintiff was highly qualified for her position. She graduated from an accredited medical school and successfully passed all United States Medical Licensing Examinations, which certified her as eligible for her internal medicine residency position at the Hospital. By all accounts, Dr. Okoli also

excelled in her clinical duties and research, which were aimed at improving patient health outcomes.

148.    Dr. Okoli's outstanding medical research skills and efforts earned her membership in the prestigious SIGMA XI, aka The Scientific Research Honor Society.

149.    Dr. Okoli was subjected to an adverse employment action when CHRISTUS summarily dismissed her under the false pretext that Okoli's failure to show adequate progress during her PIP was "detrimental to patient safety…"

150.    Dr. Okoli was treated less favorably than other similarly situated employees who were not members of her protected class because of her membership in that class. No other member of her group of internal medicine residents was subjected to similar treatment by the hospital, and Egbe made derogatory comments about Dr. Okoli's national origin.

151.    CHRISTUS treated Dr. Okoli differently from other similarly situated employees by *inter alia*:

> a.  Dr. Okoli was placed in a PIP while Residents with a lower conference attendance than that of Dr. Okoli were not;
>
> b.  CHRISTUS did not skip the Grievance and Due Process Procedure of remediation > probation > suspension > and termination regarding other employees; and

    c. Walnofer committed serious misconduct under the Hospital Residency Policies but was neither subjected to a PIP nor any Corrective Action.

152.    Egbe revealed her true motivations for her disparate treatment of Dr. Okoli when she openly criticized Dr. Okoli's disability and national origin.

153.    Egbe recruited and used other co-workers and staff to create a pretext for summarily terminating Dr. Okoli.

154.    Egbe violated the Residency Policies and Dr. Okoli's right to due process and procedural fairness when she intentionally failed to provide Dr. Okoli with written feedback during her PIP.[5]

155.    Egbe violated the Residency Policies and Dr. Okoli's right to due process and procedural fairness by failing to give Dr. Okoli a fair warning about the level of her alleged concerns about Dr. Okoli's conduct; instead, Egbe provided ambiguous and conflicting feedback to Dr. Okoli during the PIP.

156.    Egbe violated the Residency Policies and Dr. Okoli's right to due process and procedural fairness by falsely assuring Dr. Okoli that the next Corrective Action under the circumstances would be probation at worst.

157.    Based on the official Grievance and Due Process procedures and Egbe's false assurance, *inter alia*, Dr. Okoli reasonably believed and

---

[5] Egbe avoided a paper trail that would have shown that Egbe and the Hospital failed to give Dr. Okoli fair warning of the level of their alleged concerns about her conduct.

understood that if she failed to satisfactorily complete the PIP, the next Corrective Action under the circumstances would be probation at worst.

158.    While Egbe represented to Dr. Okoli that the next step in the disciplinary process under the circumstances could be probation, behind the scenes, Egbe was lobbying the CCC to skip the entire Grievance and Due Process procedures and immediately terminate Dr. Okoli's employment.

159.    Egbe unlawfully discriminated against Dr. Okoli when she created a pretextual reason to justify summarily terminating Dr. Okoli's employment, falsely claiming that Dr. Okoli's "unprofessional" conduct was of such a serious nature that it threatened patient well-being or safety.

160.    By adopting Egbe's pretextual reasons and recommendations to summarily terminate Dr. Okoli's employment, CHRISTUS violated its own written Grievance and Due Process procedures.

161.    The Hospital's stated reasons for the disparate treatment were and are pretextually meant to obscure the real reason: Egbe's discriminatory treatment based on Dr. Okoli's race and national origin.

162.    Dr. Okoli has been damaged, and the Hospital's discriminatory treatment was the direct and proximate cause of the damages Dr. Okoli complains of herein.

/ / /

/ / /

## COUNT TWO

### *Unlawful Retaliation*
### *(Title VII, Civil Rights Act of 1964; Tex. Labor Code, 21.051, et seq.)*

163.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

164.    To establish a workplace retaliation claim, a plaintiff must show (1) protected conduct, (2) materially adverse employment action, and (3) a causal relationship between the protected conduct and the materially adverse employment action. *See Continental Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 450-51 (Tex. 1996).

165.    Dr. Okoli's actions related to her reporting of Walnofer to the Hospital's Human Resources for workplace harassment are protected conduct.

166.    Egbe took adverse action against Dr. Okoli for reporting Walnofer's harassment by providing false, inaccurate, incomplete, and misleading information about Dr. Okoli to the CCC.

167.    Egbe took adverse action against Dr. Okoli for reporting Walnofer's harassment by soliciting others to provide derogatory information about Dr. Okoli.

168.    Egbe took adverse action against Dr. Okoli for reporting Walnofer's harassment by fabricating a pretext to summarily terminate the employment of Dr. Okoli.

169.    Egbe took adverse action against Dr. Okoli for reporting Walnofer's harassment when she recommended that CHRISTUS bypass the required disciplinary process, including remediation, probation, and suspension, and instead summarily terminate Dr. Okoli's employment.

170.    CHRISTUS took adverse action when it summarily terminated the employment of Dr. Okoli based on a pretextual excuse that did not meet the "serious conduct" standard set forth in the Residency Policies.

171.    When Dr. Okoli appealed the dismissal to the Residency Program's Designated Institutional Official (DIO), Dr. McDonald justified the dismissal only by vague, unsupported, and non-factual generalized allegations such as:

> "*You have been notified **on multiple occasions** of concern surrounding your professionalism, your participation in patient handovers, and interaction with other residents and attendings. Despite these notifications, your behavior has not shown consistent improvement.*"

172.    None of the reasons stated by Dr. McDonald are grounds for summary dismissal of Dr. Okoli under the Residency Policies.

173.    The adverse actions Egbe took against Dr. Okoli are directly related to the complaint Dr. Okoli made to Human Resources about the workplace harassment by Walnofer, Egbe's friend and colleague.

174.    All the relevant actions taken by Egbe and those that aided and abetted her actions were taken within the scope of their employment.

175.    The unlawful retaliation by Egbe and others at CHRISTUS was a direct and proximate cause of the damages Dr. Okoli complains of herein.

## COUNT THREE

### *Unlawful Harassment*
### *(Title VII, Civil Rights Act of 1964; Tex. Labor Code, 21.051, et seq.)*

176.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

177.    To establish a harassment claim, Dr. Okoli must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected status; (4) the harassment affected a term, condition, or privilege of her employment, and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

178.    Where the harassment is committed by a plaintiff's supervisor, the plaintiff only needs to satisfy the first four elements. *Harris Cnty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 197 (Tex. App. 2015).

179.    Dr. Okoli is an African woman from Nigeria, and therefore, she belongs to a protected group.

180.    Dr. Okoli's supervisors, Egbe, Walnofer, or both, subjected her to harassment at the workplace, a few examples of which are:

a. Egbe's cruel use of Dr. Okoli's hereditary disability (essential tremors) to demean and ridicule her;

    b.  Egbe's denigrating remarks about Dr. Okoli's national origin and immigration status;

    c.  Egbe's failure to intervene to stop Walnofer's open harassment of Dr. Okoli;

    d.  Egbe's actions to force Dr. Okoli to repeat her ICU rotation; and

    e.  Egbe's numerous adverse actions were taken to get CHRISTUS to summarily terminate the employment of Dr. Okoli.

181.    The harassment complained of affected a term, condition, or privilege of Dr. Okoli's employment, pursuant to the Resident Agreement.

182.    Egbe, Dr. Okoli's chief harasser, was also her supervisor, proving the CHRISTUS knew or should have known of the harassment and failed to take prompt remedial action.

183.    Walnofer, Dr. Okoli's second harasser, was also another CHRISTUS employee, an internal medicine resident, as well as the Chief Resident.

184.    The harassment complained of was a direct and proximate cause of the damages Dr. Okoli complains of herein.

## COUNT FOUR

### *Breach of the Employment Contract*
### (Against CHRISTUS and/or CTC)

185.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

186.     The Resident Agreement is a valid and enforceable contract.

187.     The Resident Agreement is for a specific term of employment and does not include a disclaimer that the Resident Agreement does not alter the at-will employment relationship.

188.     The Resident Agreement is between CTC, as the employer, and Dr. Okoli, the employee. However, CTC summarily terminated Dr. Okoli's employment at the behest and at the direction of CHRISTUS, in breach of the Resident Agreement.

189.     The Resident Agreement specifically provides that Dr. Okoli's Employment is also subject to the GME Handbook and the Residency Policies.

190.     Pursuant to the Resident Agreement, Dr. Okoli had the right to due process and other procedural fairness guarantees available to all Residents, as provided in the GME Handbook, Residency Policies, and the official Grievance and Due Process Policy.

191.     Dr. Okoli's rights to due process and procedural fairness were violated when Egbe and her enablers at CHRISTUS failed and refused to follow the GME Handbook, Residency Policies, and the official Grievance and Due Process Policy, and summarily terminated Dr. Okoli's employment.

192.     Pursuant to the Residency Policies, summary termination is only for very serious issues, including "substance abuse, felony conviction, or involvement in unethical or illegal activities."

40

193.    Pursuant to the Residency Policies, specifically ORA GME 007, the immediate termination of a Resident is only justified when a Resident has engaged in serious misconduct, examples of which are:

> Lying, falsification of a medical record; violation of medical record privacy; being under the influence of intoxicants or drugs; disorderly conduct; harassment of other employees, or the use of abusive language on the premises; fighting, encouraging a fight, or threatening, attempting, or causing injury to another person on the premises.

194.    Neither CTC nor CHRISTUS has ever alleged that Dr. Okoli engaged in the type of serious conduct described in the GME Handbook, Residency Policies, or the official Grievance and Due Process Policy.

195.    Knowing that Dr. Okoli has never engaged in any such serious misconduct, Egbe and her enablers at CHRISTUS created the inflammatory pretext that Dr. Okoli's conduct could potentially "endanger patient outcomes," which is nothing more than malicious speculation based on false, inaccurate, incomplete, and misleading information.

196.    As a direct and proximate result of the breach of the Resident Agreement, Dr Okoli has suffered substantial damages in an amount to be determined at trial.

197.    At all relevant times, CHRISTUS, by and through its employees, including Egbe and her enablers at CHRISTUS, directly participated in the

wrongful termination of Dr. Okoli. Therefore, CHRISTUS is vicariously liable under *Respondeat Superior*.

198.    Alternatively, Egbe and her enablers at CHRISTUS were borrowed employees, and therefore, CHRISTUS, as the borrowing employer, is liable for the misconduct of Egbe and her enablers under the "borrowed servant doctrine."

199.    Alternatively, CHRISTUS is liable because CTC was acting as an agent of CHRISTUS, the sponsoring institution of the Residency Program, at all relevant times.

200.    To the extent CHRISTUS is using CTC as an instrumentality to prevent Dr. Okoli from being fully compensated for the damages proximately caused from her wrongful termination, it would be inequitable and unjust if CHRISTUS were to escape liability for Dr. Okoli's damages; therefore, this Court should disregard CTC's corporate form and hold CHRISTUS jointly and severally liable for the resulting damages in an amount to be proven at trial.

## COUNT FIVE
### *Fraud*

201.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

202.    Egbe's representation to Dr. Okoli that if she did not complete the PIP to her satisfaction, the next Corrective Action under the circumstances

would be probation was material and false.

203.    Egbe intentionally or recklessly withheld, omitted, or concealed material information about the level of her alleged concerns regarding Dr. Okoli's conduct so that CHRISTUS would summarily terminate Dr. Okoli from the Residency Program.

204.    Egbe's false reports to the CCC about Dr. Okoli, including the inflammatory accusations that Dr. Okoli's conduct could threaten patient care and safety, were a pretext fabricated by Egbe to summarily terminate Dr. Okoli's employment.

205.    Egbe's false statements, by commission and by omission, were made intentionally or recklessly, with the intent of deceiving Dr. Okoli and inducing her to act or refrain from acting, to enforce or pursue her rights.

206.    Dr. Okoli reasonably relied on the statements, representations, and promises of Egbe when, *inter alia,* she entered into the PIP and then did not take specific actions to avoid her wrongful termination.

207.    As a direct and proximate result of the Defendants' fraudulent conduct, Dr Okoli has suffered substantial damages in an amount to be determined at trial.

208.    Defendants intentionally engaged in a pattern of aggravated and outrageous conduct with an "evil hand guided by an evil mind" with the clear intent to injure, defraud, or deliberately interfere with the legal rights of Dr.

Okoli, entitled Dr. Okoli to punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

## COUNT SIX
### *Civil Conspiracy*

209.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

210.    Defendants Egbe, Walnofer, and Shank agreed to work together to get the Hospital to wrongfully terminate Dr. Okoli's employment.

211.    Egbe, Walnofer, and Shank committed fraud and other torts to accomplish their unlawful objective to have the Hospital wrongfully terminate Dr. Okoli's employment.

212.    As part of their plan, Egbe, Walnofer, and Shank used *inter alia* the meeting with Dr Okoli on October 31, 2024, to fabricate a pretext to use against Dr. Okoli.

213.    Egbe, Walnofer, and Shank contributed to the false report of the meeting, which, as planned, Egbe provided to the CCC as proof that Dr. Okoli should be fired.

214.    Egbe, Walnofer, and Shank knew at all relevant times that their false report of the meeting on October 31, 2024, would likely result in the wrongful termination of Dr. Okoli.

215.    The Hospital fired Dr. Okoli as a direct and proximate result of the conspiracy between Egbe, Shank, and Walnofer, which in turn proximately caused Dr. Okoli's substantial damage.

216.    Conspiring together, Egbe, Shank, and Walnofer intentionally engaged in a pattern of aggravated and outrageous conduct with an "evil hand guided by an evil mind" with the clear intent to injure, defraud, or deliberately interfere with the legal rights of Dr. Okoli, entitled Dr. Okoli to punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

## COUNT SEVEN
### *Aiding and Abetting*

217.    Plaintiff realleges the factual allegations set forth above as if fully set forth herein.

218.    McDonald and others at the Hospital, including members of the GME and the CCC, substantially assisted and encouraged Egbe and her co-conspirators' discriminatory treatment of Dr. Okoli.

219.    McDonald and others at the Hospital, including members of the GME and the CCC, substantially assisted and encouraged Egbe and her co-conspirators to violate Dr. Okoli's rights to due process afforded under the Residency Policies and under state and federal law.

220.    McDonald and others at the Hospital, including members of the GME and the CCC, knew or should have known that the actions taken by Egbe and her co-conspirators to cause the Hospital to summarily terminate Dr. Okoli's employment contravened Residency Policies, were discriminatory, and violated Dr. Okoli's civil rights, including her right to due process.

221.    As a direct and proximate result of the aid and encouragement McDonald and others at the Hospital, including members of the CCC, provided to Egbe and her co-conspirators, Dr. Okoli's employment was summarily terminated, causing substantial injuries and damages to Dr. Okoli.

222.    By aiding and abetting the conspirators, they intentionally engaged in a pattern of aggravated and outrageous conduct with an "evil hand guided by an evil mind" with the clear intent to injure, defraud, or deliberately interfere with the legal rights of Dr. Okoli, entitling Dr. Okoli to punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

## **DAMAGES**

223.    As a direct result of Defendants' acts and omissions complained of herein, Plaintiff sustained actual, compensatory, incidental, and consequential damages in an amount to be determined at trial. Plaintiff further sues for punitive and/or exemplary damages for Defendants' bad faith and malicious

conduct as alleged above, in an amount to be determined at trial, but in no event less than $10,000,000.00.

## ATTORNEY FEES

224.     As a direct result of the Hospital's acts or omissions, Plaintiff was forced to retain the undersigned attorney to protect her rights and interests under Title VII of the Civil Rights Act of 1964 and the Resident Agreement with the Hospital. The Plaintiff is, therefore, entitled to recover her reasonable and necessary attorney's fees incurred as a result of prosecuting this action.

WHEREFORE Plaintiff, DR. MENKEOMA LAURA OKOLI, respectfully requests that this Honorable Court cite Defendant, CHRISTUS HEALTH, CHRISTUS TRINITY CLINIC, TIFFANY EGBE, APRIL E. WALNOFER, LACIE SHANK, and JOHN MCDONALD, to appear and answer herein and that the Court, after final trial, render judgment against Defendants CHRISTUS HEALTH, CHRISTUS TRINITY CLINIC, TIFFANY EGBE, APRIL E. WALNOFER, LACIE SHANK, and JOHN MCDONALD for back pay, front pay, compensatory, actual, punitive, incidental, and consequential damages as applicable to each defendant, for attorney's fees, costs of court, and interest at the highest legal rate, and order such other and further relief, at law and in equity, which justice may require.

Plaintiff further prays for a temporary and permanent injunction enjoining Defendant CHRISTUS HEALTH and CTC, and ordering that Dr.

Okoli be reinstated to her position as a Resident in the Residency Program so she can complete her remaining seven (7) months of residency.

Respectfully Submitted,

/s/ Nino Abate
NINO ABATE, ESQ.
ATTORNEY ID: 24134160
300 W. CLAREDON AVE. SUITE 130
PHOENIX, AZ 85013.
(T) (480) 314-3304
*nino@abatelaw.com*
Attorney for Plaintiff,
DR. MENKEOMA LAURA OKOLI